No. 26-1508

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

NOAH PETERSEN,

*Plaintiff-Appellee,*

v.

CITY OF NEWTON, IOWA; MICHAEL HANSEN, in his official and individual capacity; and ROB BURDESS, in his official and individual capacity,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Iowa
No. 4:23-cv-00408-SMR-SBJ

# PLAINTIFF-APPELLEE'S BRIEF


Gina Messamer
PARRISH KRUIDENIER, LLP
2910 Grand Avenue
Des Moines, IA 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

James T. Knight II
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
jknight@ij.org; pjaicomo@ij.org

*Counsel for Plaintiff-Appellee*

## SUMMARY OF CASE

In October 2022, Noah Petersen was arrested at two city-council meetings in Newton, Iowa, on the orders of Mayor Michael Hansen and Police Chief Rob Burdess. The first time, Noah was arrested for reading a statement criticizing the city police during the meeting's Citizen Participation period. The second time, Noah was arrested for reading a statement criticizing the Mayor and Chief for arresting him the first time. Both times, the Mayor stopped Noah before his three-minute speaking period finished and claimed Noah violated the City's (now-rescinded) "Derogatory Comments Rule." The Rule banned speakers from making critical remarks about city officials (like police) while comments "supporting the police department" were welcome. The City prosecuted Noah for disorderly conduct for both incidents. Both times it lost.

Noah filed this 42 U.S.C. § 1983 lawsuit to hold Mayor Hansen, Chief Burdess, and the City liable for violating Noah's First, Fourth, and Fourteenth Amendment rights. The district court granted Noah summary judgment on all but one claim (prior restraint)—finding defendants liable for violating Noah's rights and denying qualified immunity—and ordered a trial on damages. This interlocutory appeal follows.

Plaintiff requests fifteen minutes of oral argument.

## TABLE OF CONTENTS

Page

SUMMARY OF CASE ..... i

TABLE OF AUTHORITIES ..... v

STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE ..... 3

I. Noah became interested in City politics because he was concerned about local police abuse. ..... 3

II. On October 3, 2022, Mayor Hansen and Chief Burdess had Noah arrested for his speech. ..... 7

III. Mayor Hansen and Chief Burdess planned to arrest Noah again, then executed the plan on October 24, 2022. ..... 11

IV. While other speakers were permitted to violate the Derogatory Comments Rule, Noah was censured and arrested. ..... 16

V. Noah was found not guilty of the criminal charges. ..... 18

VI. The district court held that Defendants violated Noah's clearly-established rights. ..... 19

SUMMARY OF ARGUMENT ..... 20

STANDARD OF REVIEW ..... 22

ARGUMENT ..... 23

I. The district court properly denied Mayor Hansen and Chief Burdess qualified immunity ..... 23

A. Both the Chief and Mayor caused the violations of Noah's constitutional rights. ..... 25

1. The Chief caused both arrests. ..... 26

2. The Mayor caused both arrests too. ..... 27

B. The Mayor and Chief violated Noah's clearly-established First Amendment rights. ........ 29

1. It was clearly established that Noah had a right to criticize government officials. ........ 30

2. It was clearly established that Noah had a right to be free from viewpoint discrimination. ........ 32

3. It was clearly established that Noah had a right to be free from retaliation for his speech. ........ 35

4. It was clearly established that Noah's comments were protected speech, not defamation. ........ 38

C. The Mayor and Chief also violated Noah's clearly-established Fourth Amendment right against unreasonable seizure. ........ 40

D. The Mayor and Chief also violated Noah's clearly-established Equal Protection rights. ........ 44

E. Defendants are mistaken that a right is only clearly established if an earlier case addressed the exact same facts. ........ 48

1. Defendants' view of *Nord* and *Morgan* is mistaken. ........ 49

2. Defendants' errant application of *Morgan* is particularly misplaced in a First Amendment case like Noah's without split-second decisions. ........ 50

II. The district court properly found *Monell* liability, which cannot be reviewed on this interlocutory appeal ........ 53

A. This Court lacks interlocutory appellate jurisdiction over the City's liability. ........ 53

B. The district court correctly held the City liable. ........ 55



Appellate Case: 26-1508 Page: 4 Date Filed: 08/07/2026 Entry ID: 5670027

CONCLUSION........................................................................................59
CERTIFICATE OF COMPLIANCE ...........................................................60
CERTIFICATE OF SERVICE.......................................................................61

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Creighton*,
483 U.S. 635 (1987) .......... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 26

*Baribeau v. City of Minneapolis*,
596 F.3d 465 (8th Cir. 2010) .......... 40

*Boddy v. Frech*,
178 F.4th 264 (6th Cir. 2026) .......... 35

*Brown v. City of Golden Valley*,
574 F.3d 491 (8th Cir. 2009) .......... 51

*Brown v. City of St. Louis*,
40 F.4th 895 (8th Cir. 2022) .......... 41

*Buckley v. Littell*,
539 F.2d 882 (2d Cir. 1976) .......... 39

*Business Leaders in Christ v. University of Iowa*,
991 F.3d 969 (8th Cir. 2021) .......... 33

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 47

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .......... 52

*City of Houston v. Hill*,
482 U.S. 451 (1987) .......... 36

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*,
429 U.S. 167 (1976) .......................................................................... 31

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) .......................................................................... 55

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......................................................................... 52

*Edwards v. South Carolina*,
372 U.S. 229 (1963) .......................................................................... 31, 32

*Felts v. Green*,
91 F.4th 938 (8th Cir. 2024) .......................................................................... 56

*Flowers v. City of Minneapolis*,
558 F.3d 794 (8th Cir. 2009) .......................................................................... 45

*Galanakis v. Newton*,
No. 4:23-cv-00044-SHL-SBJ, 2023 WL 3479167
(S.D. Iowa May 8, 2023) .......................................................................... 39

*Galanakis v. Newton*,
No. 4:23-cv-00044-SHL-SBJ, 2024 WL 606235
(S.D. Iowa Feb. 8, 2024) .......................................................................... 3, 39

*Gerlich v. Leath*,
861 F.3d 697 (8th Cir. 2017) .......................................................................... 33

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) .......................................................................... 28, 37, 38

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) .......................................................................... 32, 33

*Graham v. Connor*,
490 U.S. 386 (1989) .......................................................................... 51

*Hagans v. Franklin Cnty. Sheriff's Off.*,
695 F.3d 505 (6th Cir. 2012)....................................................50

*Hall v. Shipley*,
932 F.2d 1147 (6th Cir. 1991)..............................................26, 28

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982).............................................................23

*Hartman v. Moore*,
547 U.S. 250 (2006).............................................................35

*Hicks v. LeBlanc*,
81 F.4th 497 (5th Cir. 2023)...................................................39

*Hoggard v. Rhodes*,
141 S. Ct. 2421 (2021)...........................................................51

*Hope v. Pelzer*,
536 U.S. 730 (2002)....................................................... *passim*

*Iancu v. Brunetti*,
588 U.S. 388 (2019).................................................. 33, 34, 35

*James ex rel. James v. Sadler*,
909 F.2d 834 (5th Cir. 1990) ............................................. 27, 28

*Janklow v. Newsweek*,
788 F.2d 1300 (8th Cir. 1986) ............................................ 32, 39

*K.W.P. v. Kansas City Pub. Schs.*,
931 F.3d 813 (8th Cir. 2019) .................................................29

*Kincade v. City of Blue Springs*,
64 F.3d 389 (8th Cir. 1995).....................................................54

*Langford v. Norris*,
614 F.3d 445 (8th Cir. 2010)...................................................22

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018) .................................................................. 31

*Matal v. Tam*,
582 U.S. 218 (2017).............................................................. 33, 34, 35

*McCabe v. Macaulay*,
551 F. Supp. 2d 771 (N.D. Iowa 2007).............................................42

*McMillian v. Monroe County*,
520 U.S. 781 (1997)................................................................56

*Merriott v. City of Bossier City*,
179 F.4th 393 (5th Cir. 2026)......................................................35

*Mettler v. Whitledge*,
165 F.3d 1197 (8th Cir. 1999) .....................................................55

*Mitchell v. Forsyth*,
472 U.S. 511 (1985)................................................................29

*Mitchell v. Kirchmeier*,
28 F.4th 888 (8th Cir. 2022) .......................................................56

*Molina v. City of St. Louis*,
59 F.4th 334 (8th Cir. 2023)................................................ 35, 36, 42

*Molina v. City of St. Louis*,
766 F. Supp. 3d 857 (E.D. Mo. 2025) ...................................... 54, 55

*Monell v. Dep't of Social Servs.*,
436 U.S. 658 (1978) ............................................................. *passim*

*Morgan v. Robinson*,
920 F.3d 521 (8th Cir. 2019)................................................48, 49, 50

*Mullenix v. Luna*,
577 U.S. 7 (2015) ..................................................................48



Appellate Case: 26-1508 Page: 9 Date Filed: 08/07/2026 Entry ID: 5670027

*NAACP v. Button*,
371 U.S. 415 (1963) .......................................................................... 36

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......................................................................... 30, 31

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......................................................................... 36, 37, 38

*Nord v. Walsh County*,
757 F.3d 734 (8th Cir. 2014) .......................................................... 48, 49

*Novak v. City of Parma*,
33 F.4th 296 (6th Cir. 2022) .......................................................... 37, 38, 42

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .......................................................................... 42

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......................................................................... 47

*Reichle v. Howards*,
566 U.S. 658 (2012) .......................................................................... 48

*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021) .............................................................................. 23, 48

*Safford United Sch. Dist. No. 1 v. Redding*,
557 U.S. 364 (2009) .......................................................................... 52

*Sause v. Bauer*,
585 U.S. 957 (2018) .......................................................................... 34, 52

*Sause v. Bauer*,
859 F.3d 1270 (10th Cir. 2017) ........................................................ 52

*Shannon v. Koehler*,
616 F.3d 855 (8th Cir. 2010) ............................................................ 22



Appellate Case: 26-1508 Page: 10 Date Filed: 08/07/2026 Entry ID: 5670027

*Soltesz v. Rushmore Plaza Civic Ctr.*,
847 F.3d 941 (8th Cir. 2017) .......... 56

*St. German of Alaska E. Orthodox Cath. Church v. United States*,
840 F.2d 1087 (2d Cir. 1988) .......... 45

*State v. Hardin*,
498 N.W.2d 677 (Iowa 1993) .......... 43

*Swint v. Chambers Cnty. Comm'n*,
514 U.S. 35 (1995) .......... 53

*Taylor v. Riojas*,
592 U.S. 7 (2020) .......... 48

*Thurairajah v. City of Fort Smith*,
925 F.3d 979 (8th Cir. 2019) .......... 31, 32

*Tlamka v. Serrell*,
244 F.3d 628 (8th Cir. 2001) .......... 29, 50

*United States v. Lanier*,
520 U.S. 259 (1997) .......... 30

*Veneklase v. City of Fargo*,
78 F.3d 1264 (8th Cir. 1996) .......... 22, 53, 54

*Villarreal v. City of Laredo*,
134 F.4th 273 (5th Cir. 2025) .......... 51

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .......... 47

*Watertown Equip. Co. v. Norwest Bank Watertown, N.A.*,
830 F.2d 1487 (8th Cir. 1987) .......... 44

*Wayte v. United States*,
470 U.S. 598 (1985) .......... 44

*Webb v. City of Maplewood*,
889 F.3d 483 (8th Cir. 2018) .......... 54

*Wesby v. District of Columbia*,
765 F.3d 13 (D.C. Cir. 2014) .......... 27

*Whirl v. Kern*,
407 F.2d 781 (5th Cir. 1968) .......... 51

**Statutes**

42 U.S.C. § 1983 .......... *passim*

Iowa Code § 723.4(1)(d) .......... 11

**Constitutional Provisions**

U.S. Const. amend. I .......... *passim*

U.S. Const. amend. IV .......... *passim*

U.S. Const. amend. XIV .......... *passim*

**Other Authorities**

Justin K. Comer, *Arrest at Newton, IA City Council Meeting (10/24/2022)*, YouTube .......... 15

Newton, *City Council Meeting 9-06-22* .......... 5

Newton, *City Council Meeting 10-03-22* .......... 8

Newton, *City Council Meeting 10-24-22* .......... 12

## STATEMENT OF THE ISSUES

Plaintiff Noah Petersen was twice arrested for violating a Newton, Iowa, rule against speakers at city-council meetings making "derogatory comments" about government officials. The district court determined that these arrests violated Noah's clearly established First, Fourth, and Fourteenth Amendment rights and held Mayor Hansen and Police Chief Burdess liable for these violations, denying qualified immunity. It also held the City of Newton liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because it determined that the violations of Noah's rights were city policy, and the City argues that this Court has pendent jurisdiction to review that determination on this interlocutory appeal. The issues are:

I. Whether Mayor Hansen and Chief Burdess are entitled to qualified immunity for their violations of Noah's constitutional rights.

**Cases:** *Janklow v. Newsweek*, 788 F.2d 1300 (8th Cir. 1986)

*Novak v. City of Parma*, 33 F.4th 296 (6th Cir. 2022)

*Gonzalez v. Trevino*, 602 U.S. 653 (2024)

*Hope v. Pelzer*, 536 U.S. 730 (2002)

II. Whether this Court has pendent jurisdiction to hear the City's interlocutory appeal over its liability.

**Cases:** *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35 (1995)

*Veneklase v. City of Fargo*, 78 F.3d 1264 (8th Cir. 1996)

III. If the Court has jurisdiction over the City's liability, whether the violations of Noah's rights were official city policy.

**Cases:** *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)

*Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1999)

On all three issues, the most apposite statute is **42 U.S.C. § 1983** and the most apposite constitutional provisions are the **First**, **Fourth**, and **Fourteenth Amendments** to the U.S. Constitution.



Appellate Case: 26-1508 Page: 14 Date Filed: 08/07/2026 Entry ID: 5670027

## STATEMENT OF THE CASE

This is a case about a man who was arrested for his speech criticizing local government. Plaintiff-Appellee and concerned citizen Noah Petersen was twice arrested at the direction of the mayor and police chief of his hometown—Newton, Iowa—because he criticized them and another city official during two public city-council meetings. Then-Mayor Michael Hansen, Police Chief Rob Burdess, and the City of Newton are the Defendants-Appellants in this case. They filed this interlocutory appeal because the district court held them liable for violating Noah's First, Fourth, and Fourteenth Amendment rights.

### I. Noah became interested in City politics because he was concerned about local police abuse.

Noah grew up in Newton, but he only began attending city-council meetings after Newton police officer Nathan Winters arrested Tayvin Galanakis, a former classmate. App. 383-84; R. Doc. 27-1, at 19-20 ¶104. In the high-profile case, Officer Winters pulled over Tayvin in August 2022 and arrested him for driving under the influence, despite a 0.00 breathalyzer reading. App. 382; R. Doc. 27-1, at 18 ¶96. *See generally Galanakis v. Newton*, No. 4:23-cv-00044-SHL-SBJ, 2024 WL 606235 (S.D. Iowa Feb. 8, 2024) (separate litigation arising out of Tayvin's arrest). Noah thought what happened to Tayvin was wrong, so he started investigating. App. 383-84;

R. Doc. 27-1, at 19-20 ¶¶100-01, ¶104. He was alarmed to discover that a domestic abuse petition had been filed against Officer Winters by an ex-girlfriend, who then obtained a no-contact order against Winters. App. 390; R. Doc. 27-1, at 26 ¶142. Noah wanted to learn more, so he sent the Newton Police a public-records request for communications related to the domestic abuse petition. App. 383; R. Doc. 27-1, at 19 ¶100. The request was denied. *Id.* ¶103.

Noah decided to raise his concerns about Tayvin's arrest and the department's handling of Officer Winters directly with city government. App. 383-84; R. Doc. 27-1, at 19-20 ¶104. Newton holds twice-monthly public city-council meetings. App. 366-67; R. Doc. 27-1, at 2-3 ¶¶9-10. The mayor sets each meeting's agenda, though the city administrator and city-council members can give input. App. 367-68; R. Doc. 27-1, at 3-4 ¶16. The agenda includes a "Citizen Participation" section when individuals can be recognized by the mayor to speak to the city council from the podium about city policies or services for up to three minutes. App. 368-69; R. Doc. 27-1, at 4-5 ¶¶18-19, ¶¶21-23. But from 2019-2023 the Derogatory Comments Rule also governed public comments: "Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual." *Id.* ¶23.

The first city-council meeting Noah attended was on September 6, 2022.[1] App. 383-84; R. Doc. 27-1, at 19-20 ¶104. Though he arrived too late for the Citizen Participation period, he got up to speak twice when citizens were invited to comment on city budget items. App. 386-87; R. Doc. 27-1, at 22-23 ¶120, ¶126. The first time, Noah suggested that funding for a proposed splash-pad could come from the police budget because, he said, the Newton Police "are a violent and human civil rights violating organization." App. 386; R. Doc. 27-1, at 22 ¶121. *See also* App. 1325; R. Doc. 27-4, at 51 (Sep. 6 Video 40:00-40:35). The Mayor gaveled Noah down, called up a Newton police officer, and said that Noah was "stopped from speaking disparagingly about the Newton Police Department." App. 386-87; R. Doc. 27-1, at 22-23 ¶122. When the Mayor threatened to have Noah removed, Noah sat down. App. 387; R. Doc. 27-1, at 23 ¶¶123-25. Noah spoke again on a proposed clothing allowance policy for city staff that he thought covered the police. App. 387-88; R. Doc. 27-1, at 23-24 ¶¶126-29. Noah was mistaken, but Mayor Hansen didn't explain that. *Id.* ¶129. Instead, he immediately gaveled Noah down and ordered a police officer to escort Noah out of the meeting.

---

[1] Newton's website has recordings of city-council meetings. *See* Newton, *City Council Meeting 9-06-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-90622-272#player ("Sep. 6 Video") (Noah speaks at 39:53).



Appellate Case: 26-1508 Page: 17 Date Filed: 08/07/2026 Entry ID: 5670027

*Id.* ¶¶129-30. Noah is the only person that Mayor Hansen ever gaveled down. *Id.* ¶131.

Noah was undeterred and emailed Mayor Hansen after the meeting. *Id.* ¶133. Noah hoped that the Mayor would help him obtain the requested documents about Officer Winters. *Id.* ¶134. Noah knew about the no-contact order, which prohibited Officer Winters from communicating with his ex-girlfriend or going near her residence; it also ordered him not to abuse her. App. 389; R. Doc. 27-1, at 25 ¶140. Noah explained to Mayor Hansen that the public had a right to know how the Newton Police had responded. App. 388; R. Doc. 27-1, at 24 ¶135.

Mayor Hansen refused to help. App. 390; R. Doc. 27-1, at 26 ¶¶144-46. Worse, Mayor Hansen responded that "Officer Winters has NEVER been charged or convicted of any type of domestic violence"—and that the restraining order Noah referenced was "a CIVIL matter agreed to by BOTH parties." *Id.* ¶¶144-45. (Mayor Hansen later admitted that he doesn't know the difference between civil and criminal domestic violence matters. *Id.* ¶147.) For Noah, Mayor Hansen's response confirmed Defendants' stonewalling and that he needed to return to a city-council meeting.

## II. On October 3, 2022, Mayor Hansen and Chief Burdess had Noah arrested for his speech.

Noah went to the October 3, 2022 meeting. App. 390-91; R. Doc. 27-1, at 26-27 ¶148. Chief Burdess was there too, so before the meeting Noah approached him to briefly discuss the public-records request about Officer Winters. App. 391; R. Doc. 27-1, at 27 ¶¶150-53. Chief Burdess told Noah that he already answered all the questions he could about the request. *Id.* ¶153.

At the start of the Citizen Participation period, Mayor Hansen read the Derogatory Comments Rule and began calling on individuals to take turns speaking from the podium. *Id.* ¶154. Many residents spoke, mostly about a contentious rental inspection program and the inspector Newton had hired to run it. App. 392; R. Doc. 27-1, at 28 ¶¶155-61. Though several speakers leveled serious criticisms and accusations at the rental inspector, Mayor Hansen did not enforce the Rule on any of them. *See infra*, Section IV.

The Mayor's tack changed when Noah spoke. Noah approached the podium, gave his name, and explained that he would read a prepared statement. App. 397; R. Doc. 27-1, at 33 ¶¶191-92. Noah then read his statement:

> Hello. This is my public comment for City Council meeting, now October 3rd, 2022. Defund Newton Police Department. They are a violent, civil and human rights violating organization who do not make your community safer. They are also pro domestic abuse because they are currently employing a domestic abuser



Appellate Case: 26-1508 Page: 19 Date Filed: 08/07/2026 Entry ID: 5670027

> and choosing to not release the records about that domestic abuser.

App. 398; R. Doc. 27-1, at 34 ¶195.[2]

Before Noah could finish (and long before his three minutes were up), Mayor Hansen interrupted Noah by banging his gavel and calling Noah out of order. *Id.* ¶196. Mayor Hansen stopped Noah because, in his opinion, Noah made "false statements and rose to defamatory intent." *Id.* ¶198. Noah based his statement on Tayvin's arrest, discoveries he made through a public-records request for Newton's arrest data, and his concerns about Newton's handling of Officer Winters's no-contact order. App. 399-400; R. Doc. 27-1, at 35-36 ¶¶205-12. But while the Mayor interpreted comments aimed at the rental inspector as merely "opinion," he decided that Noah's intent was to defame Chief Burdess and the Newton Police Department. App. 393, 398; R. Doc. 27-1, at 29 ¶167, 34 ¶¶199-201. In contrast, if Noah made "a comment supporting the police department," then, as Mayor Hansen later explained, "of course" Noah would "not violate the Derogatory Comments Rule." App. 399; R. Doc. 27-1, at 35 ¶204.

---

[2] Newton, *City Council Meeting 10-03-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-100322-282#player (Noah speaks at 43:49).



Appellate Case: 26-1508 Page: 20 Date Filed: 08/07/2026 Entry ID: 5670027

Mayor Hansen called Chief Burdess up to the podium. App. 401; R. Doc. 27-1, at 37 ¶215. After only nineteen seconds of debate between Noah and Mayor Hansen, where Noah insisted that Mayor Hansen was violating the Constitution by silencing him, *id.* ¶¶218-19, Mayor Hansen ordered Chief Burdess to "escort [Noah] out of the chambers." *Id.* ¶221. Chief Burdess then grabbed Noah by the shoulder and said, "Let's go." App. 402; R. Doc. 27-1, at 38 ¶¶223-25. Noah and Mayor Hansen briefly debated more, with Mayor Hansen telling Noah that he was violating the Rule and Noah telling Mayor Hansen that he was violating the First Amendment. *Id.* ¶¶226-29. This lasted less than thirty seconds, when Chief Burdess told Noah he would "be arrested if you don't leave." *Id.* ¶230. When Noah insisted that he had a constitutional right to his "three minutes to give the government some criticism," Chief Burdess told Noah to place his hands behind his back, placed Noah in handcuffs, and walked him out of the city-council chambers. App. 403; R. Doc. 27-1, at 39 ¶¶233-36. Noah's final comment was, "Arrest me for speaking my First Amendment rights. Go ahead. You should be ashamed of yourselves." *Id.* ¶235.

When Chief Burdess decided to arrest Noah, he had two crimes in mind: trespass and disorderly conduct. App. 404; R. Doc. 27-1, at 40 ¶246. Both offenses require that the suspect lack "justification" or "lawful

authority" to be where he was. App. 405, 407; R. Doc. 27-1, at 41 ¶¶254-55, 43 ¶¶266-67. To make a probable-cause determination about this element of the alleged crimes, Chief Burdess gave a helpful example: "I mean, if someone walks up there and they're black and the mayor says, 'I don't want you here because you're black, and you have to leave,' that would be a problem." App. 406; R. Doc. 27-1, at 42 ¶261. Chief Burdess explained that he'd then need to make a probable-cause determination of whether the Mayor's order was lawful—or whether the speaker had the lawful right to speak. App. 406-07; R. Doc. 27-1, at 42-43 ¶¶259-62.

For Noah, Chief Burdess admitted that Noah had a legal right to give his comment during the Citizen Participation period. App. 406; R. Doc. 27-1, at 42 ¶257. Yet Chief Burdess concedes his probable-cause analysis didn't consider Noah's rights—or his "lawful authority" to be where he was—"at all." *Id.* Chief Burdess did not consider whether Noah had a First Amendment right to finish his comment, nor whether Mayor Hansen's order violated Noah's rights. *Id.* ¶258. Instead, Chief Burdess's probable-cause analysis relied entirely on Mayor Hansen's determination that Noah violated the Derogatory Comments Rule without independent analysis. App. 407-08; R. Doc. 27-1, at 43-44 ¶¶268-70. To use Chief Burdess's example, this would be the equivalent of arresting the black speaker just because the Mayor told

him to. *See* App. 406-07; R. Doc. 27-1, at 42-43 ¶¶260-62; *see also* App. 407; R. Doc. 27-1, at 43 ¶265 (if this happened again today, Chief Burdess would "make a little bit of my own assessment").

Noah was ultimately charged with disorderly conduct for disrupting a lawful assembly under Iowa Code § 723.4(1)(d). App. 407-08; R. Doc. 27-1, at 43-44 ¶266, ¶271. This is "a simple misdemeanor," the "lowest form of criminal classification in Iowa." App. 408; R. Doc. 27-1, at 44 ¶272. As arresting documents confirmed, Noah didn't yell, threaten anyone, use profanity, go over his three minutes, harm anyone or himself, damage any property, throw anything, or have a weapon. App. 408-09; R. Doc. 27-1, at 44-45 ¶¶273-79. Still, Chief Burdess sent Noah to jail. App. 409-410; R. Doc. 27-1, at 45-46 ¶¶282-87.

## III. Mayor Hansen and Chief Burdess planned to arrest Noah again, then executed the plan on October 24, 2022.

The day after Noah's arrest, Mayor Hansen talked with Chief Burdess and the city administrator to discuss "how do we deal with this" if it happens again. App. 411; R. Doc. 27-1, at 47 ¶¶294-96. They came up with a plan: If Noah (or another speaker) returned to a city-council meeting and insisted that he had a First Amendment right to criticize government officials despite the Derogatory Comments Rule, the city officials would "suspend the business meeting" and have police arrest Noah, recharge him with disorderly



Appellate Case: 26-1508 Page: 23 Date Filed: 08/07/2026 Entry ID: 5670027

conduct, and serve him with a "no-trespass order" barring Noah from entering the city building for twenty-four hours. App. 411-12; R. Doc. 27-1, at 47-48 ¶¶298-303. Chief Burdess also planned to have two extra officers in the building during the next city-council meeting to execute the plan. App. 412; R. Doc. 27-1, at 48 ¶¶304-05.

Noah went to the next city-council meeting on October 24, 2022.[3] App. 414; R. Doc. 27-1, at 50, ¶312. He returned to continue voicing his "concerns about the police, to directly criticize [the] people who had arrested [him] at the previous meeting, and to show that the city couldn't intimidate [him] successfully." *Id.* ¶315. Chief Burdess also attended, along with Lieutenant Wing, a Newton police officer Chief Burdess had directed to attend. App. 412, 414; R. Doc. 27-1, at 48 ¶305, 50 ¶316.

Before the Citizen Participation period started, Mayor Hansen explained that, "in light of recent events" at city-council meetings—and after talking with the city attorney, Chief Burdess, and the city administrator—Mayor Hansen wanted to give the audience "a little civics lesson" and remind everyone about the Derogatory Comments Rule. App. 414-15; R. Doc. 27-1, at 50-51 ¶317. The city attorney then read a prepared statement that warned

[3] Newton, *City Council Meeting 10-24-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-102422-284#player (City attorney speaks at 15:30, Noah speaks at 21:50).



Appellate Case: 26-1508 Page: 24 Date Filed: 08/07/2026 Entry ID: 5670027

everyone that "mak[ing] derogatory comments referencing individual citizens or employees" would violate the Rule. App. 415; R. Doc. 27-1, at 51 ¶¶318-20. Although the city attorney claimed that citizens were allowed to give their opinion, he doubled down on Mayor Hansen's power to stop and remove any speaker that Mayor Hansen determined, in his sole discretion, made a derogatory comment. *Id.* ¶¶319-22. Mayor Hansen then read the Rule. App. 416; R. Doc. 27-1, at 52 ¶326.

Noah volunteered to speak third. *Id.* ¶¶328-29. Before Noah gave his comment, Mayor Hansen "cautioned" Noah and warned him not to violate the Rule. *Id.* ¶330. This was the only time Mayor Hansen ever made such a threat. *Id.* ¶331.

Noah then began reading a prepared comment from his phone. *Id.* ¶332. Noah talked about Tayvin's arrest, the Newton Police, and other topics related to city funding and policy. App. 416-17; R. Doc. 27-1, at 52-53 ¶¶333-36. Noah then pivoted to "speak a little bit about last meeting." App. 417; R. Doc. 27-1, at 53 ¶337. Noah explained: "This is … what I think should happen. I think the top two fascists in this town, Mayor Michael Hansen and the chief of police, need to be removed from power." *Id.* ¶338.

Mayor Hansen immediately gaveled down Noah and told him to "not address the chief of police in that manner." *Id.* ¶339. Noah responded to



Appellate Case: 26-1508 Page: 25 Date Filed: 08/07/2026 Entry ID: 5670027

Mayor Hansen: "I addressed you too in that manner, too, to be clear." *Id.* ¶340. Mayor Hansen gave the same warning and told Noah to "continue on," but Noah repeated the same criticism: "The chief of police and mayor of this town are two top fascists, and they need to go." App. 418; R. Doc. 27-1, at 54 ¶341. Mayor Hansen again gaveled down Noah and told him that his three-minute period was "over" and "ceased." *Id.* ¶342.

According to Mayor Hansen, Noah violated the Derogatory Comments Rule by calling Chief Burdess a fascist. App. 418-19; R. Doc. 27-1, at 54-55 ¶¶344-45, ¶351. Consistent with Defendants' pre-meeting plan, Mayor Hansen suspended the meeting and instructed Noah "to leave the council chambers now." App. 418-20; R. Doc. 27-1, at 54-56 ¶348, ¶¶355-56. Around the same time, Chief Burdess and Lieutenant Wing both stood up and converged on Noah. App. 419; R. Doc. 27-1, at 55 ¶350.

About thirty seconds after Mayor Hansen suspended the meeting and told Noah to leave, Noah began leaving. App. 419-20; R. Doc. 27-1, at 55-56 ¶¶354-57. As Chief Burdess put it, Noah "started veering for the door." *Id.* ¶358. But as Noah was attempting to leave, Lieutenant Wing stopped Noah and arrested him. *Id.* ¶¶360-62 ("I'm leaving. I'm literally trying to leave and you're stopping me."). Consistent with Chief Burdess's pre-meeting plan, Noah was charged with disorderly conduct and served a no-trespass order.



Appellate Case: 26-1508 Page: 26 Date Filed: 08/07/2026 Entry ID: 5670027

App. 421, 423-24; R. Doc. 27-1, at 57 ¶368, 59-60 ¶379, ¶¶381-82. Chief Burdess later testified that the probable-cause analysis didn't change from the first arrest, even though this time—unlike the first arrest—Noah was walking toward the door. App. 421; R. Doc. 27-1, at 57 ¶¶364-67.

Meanwhile, back inside the city-council chambers, Mayor Hansen was lecturing everyone about political activism. App. 421-22; R. Doc. 27-1, at 57-58 ¶369. When the Mayor suspended the meeting, that stopped Newton's recording as well and shut off the cameras in the room. App. 414, 419; R. Doc. 27-1, at 50 ¶314, 55 ¶349. There is a video of Noah's arrest after that point only because one of Noah's friends was recording from the audience.[4] *Id.* That video also captured Mayor Hansen's post-arrest comments to attendees (apparently intended to be off-the-record). *Id.*

Mayor Hansen told residents there were plenty of *other* places to be politically active, such as the county board of supervisors and the state legislature. App. 421-22; R. Doc. 27-1, at 57-58 ¶¶369-70, ¶372. But, he said, a Newton city-council meeting is not a place to be "political." *Id.* ¶369. Of course, the board of supervisors and the state legislature have nothing to do with Noah's concerns about the Newton Police—only Newton does. App. 371,

---

[4] Justin K. Comer, *Arrest at Newton, IA City Council Meeting (10/24/2022)*, YouTube, https://tinyurl.com/NoahSecondArrest (suspending meeting at 2:39).



Appellate Case: 26-1508 Page: 27 Date Filed: 08/07/2026 Entry ID: 5670027

422-23; R. Doc. 27-1, at 7 ¶32, 58-59 ¶¶371-73, ¶377. But Mayor Hansen didn't stop Noah because he was in the wrong venue—it was because he didn't want to hear Noah's speech. As Mayor Hansen stated at the end of his lecture: "Go do your activism somewhere where somebody cares." App. 423; R. Doc. 27-1, at 59 ¶376.

This time, Newton alleged that Noah committed a crime by: (1) "speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "us[ing] the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this." *Id.* ¶380. As before, Noah did not yell, threaten anyone, use profanity, go over his three minutes, harm anyone or himself, damage any property, throw anything, or have a weapon. App. 424; R. Doc. 27-1, at 60 ¶383.

## IV. While other speakers were permitted to violate the Derogatory Comments Rule, Noah was censured and arrested.

Noah is the only person ever censured or arrested for violating the Derogatory Comments Rule—let alone on three separate occasions—but he's not the only person to make derogatory comments about an individual at a Newton city-council meeting. At the September 6 meeting, a woman named Emily Tomlinson sharply criticized Newton city officials for only serving "their own personal agendas." App. 385-86; R. Doc. 27-1, at 21-22 ¶¶111-18.



Appellate Case: 26-1508 Page: 28 Date Filed: 08/07/2026 Entry ID: 5670027

Mayor Hansen didn't interrupt Emily or enforce the Rule, later saying that he made a "judgment call" that she hadn't violated the Rule because he didn't know what she meant and her comments didn't "rise to the level of defamation, character assassination," or "causing any damage to anybody's reputation." *Id.* ¶¶115-19. But when Noah criticized the police department, Mayor Hansen gaveled Noah down, called up a police officer, and said Noah was "stopped from speaking disparagingly about the Newton police department." App. 386-87; R. Doc. 27-1, at 22-23 ¶122.

The Mayor continued to single out Noah and his criticism of the police at the October 3, 2022 meeting. There, several speakers criticized a city rental inspector without censure or consequence, only for Noah to later be arrested for criticizing the city police. The criticisms aimed at the inspector were detailed and serious. The first speaker—Fred Rhodes—accused the inspector of fraud and corruption. App. 392-94; R. Doc. 27-1, at 28-30 ¶¶162-74. Fred said the inspector admitted, "on more than one occasion," that "he can fail any house [or business] if he chooses." *Id.* ¶174. And so, the rental inspector has "a blank check that he can fill out at any time to give a substantial boost to his own income." *Id.* ¶169. Even worse, Fred said, "our inspector has been given free rein" to change the rules so he can find whatever violations he wants. *Id.* ¶165. According to Mayor Hansen, this

comment was "totally false." *Id.* ¶166. But, despite being a "totally false" statement about an "individual" (*see* App. 369; R. Doc. 27-1, at 5 ¶23), Mayor Hansen said Fred did not violate the Rule because "it was just an opinion on his part." App. 393; R. Doc. 27-1, at 29 ¶167.

Other critics were given similarly free rein. The Mayor's "very good friend" Barney Bushore "reiterat[ing]" what Fred said and adding more criticism for the inspector? App. 395; R. Doc. 27-1, at 31 ¶¶178-79. Fine by the Mayor because Barney called him *before* the meeting, so Mayor Hansen "knew what he was talking about." *Id.* ¶180. Dana VanGilder's accusations that the inspector intentionally failed people to make money? App. 395-96; R. Doc. 27-1, at 31-32 ¶182. The Mayor says that was flat "wrong"—and she "should have known" it was false—but it didn't violate the Rule because he called her *after* the meeting. App. 396; R. Doc. 27-1, at 32 ¶¶184-85.

## V. Noah was found not guilty of the criminal charges.

Newton didn't drop the issue after silencing Noah. When the county refused to prosecute Noah for either arrest, the City brought the case to trial instead. App. 428; R. Doc. 27-1, at 64 ¶¶402-08. After a bench trial on the first charge, Noah was found not guilty. App. 428-29; R. Doc. 27-1, at 64-65 ¶¶409-12. The court explained that Noah had a right to speak and "[n]othing" Noah did "substantially impaired the … meeting." App. 429; R. Doc. 27-1, at

65 ¶415. Noah "used no profane language," did not "identify any individual by name," "did not act in any objectively unreasonable manner," "remained behind the podium," and "did not use abusive language or gestures." App. 429-30; R. Doc. 27-1, at 65-66 ¶416, ¶422. As a result, "[w]hile some may not agree with the content of [Noah's] statements," they "were not 'derogatory.'" App. 430; R. Doc. 27-1, at 66 ¶422. And even if they were, the Rule would violate the First Amendment. App. 429-30; R. Doc. 27-1, at 65-66 ¶417, ¶¶420-21. Newton dismissed the second charge. App. 431; R. Doc. 27-1, at 67 ¶424.

## VI. The district court held that Defendants violated Noah's clearly-established rights.

Noah filed this § 1983 suit against the Mayor, Chief, and City for violating his constitutional rights during the arrests. App. 1-56; R. Doc. 1, at 1-56. Following discovery, the parties cross-moved for summary judgment on liability. The district court granted Noah's motion on all but one count,[5] finding that the Mayor, Chief, and City violated Noah's First Amendment right to speak, Fourth Amendment right against unreasonable seizure, and Fourteenth Amendment right to equal protection of the laws during both

[5] Noah had argued that the Rule was an unconstitutional prior restraint on speech, but the district court disagreed and ruled for the City. App. 1676-77; R. Doc. 62, at 23-24. That issue is not involved in this appeal.

arrests. The court also held that Noah's rights were clearly established at the time of the arrests and so denied qualified immunity. The court thus entered judgment for Noah on liability against all three defendants and ordered the case to trial to determine damages. The Mayor and Chief filed this interlocutory appeal to challenge the denial of qualified immunity. The City also appealed, claiming that this Court has pendent jurisdiction to address its liability.

## SUMMARY OF ARGUMENT

Like every American, Noah Petersen has views on governance that are shared by some and disliked by others. Thankfully, the First Amendment protects every American's right to disagree and dissent. But when Noah tried to criticize his local government and government officials—including Defendants Mayor Hansen, Chief Burdess, and the City—they silenced, arrested, jailed, charged, and prosecuted Noah *solely* because of his speech. For that, Noah filed this § 1983 lawsuit to hold them accountable, and the district court ruled that he is entitled to summary judgment.

Defendants now appeal, arguing they should be immune from liability for Noah's arrests. The Mayor and Chief's excuse is qualified immunity—they first try to shirk the blame by pointing fingers, then claim that Noah's rights weren't clearly established, so they couldn't have known they were doing

anything wrong. But the district court was right to reject these arguments, as Noah explains in **Section I**. The Mayor and Chief's squabbles about who placed the cuffs on Noah are irrelevant, as **Section I-A** shows. Because federal law confers liability on *every* person who causes someone to be subjected to the deprivation of constitutional rights, 42 U.S.C. § 1983, that includes the Mayor and Chief who orchestrated both arrests. **Sections I-B** through **I-E** walk through what any reasonable government official would think obvious: The law clearly establishes that government officials may not single out critics and arrest them in retaliation for their speech. As the district court recognized, decades of caselaw from the Supreme Court and this Court have held that such arrests violate the First, Fourth, and Fourteenth Amendments. When government officials violate those rights, qualified immunity does not shield them from liability.

The City tries to join in too, claiming it can't be held liable for the actions of its mayor and chief of police because those actions weren't city policy. In **Section II-A**, Noah explains that this Court lacks jurisdiction to consider the City's appeal—both the Supreme Court and this Court have been clear that municipalities can't latch on to qualified immunity appeals, since the issues and analysis are separate. **Section II-B** then shows why the City's arguments to escape liability fail anyway.

## STANDARD OF REVIEW

This interlocutory appeal arises from cross-motions for summary judgment, where the district court denied qualified immunity and held all defendants liable for violating Noah's rights. This Court has "limited authority to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine." *Shannon v. Koehler*, 616 F.3d 855, 860-61 (8th Cir. 2010) (cleaned up) (quoting *Langford v. Norris*, 614 F.3d 445, 455 (8th Cir. 2010)). Review is "limited to determining" whether the individual defendants violated Noah's "clearly established federal rights." *Id.* at 861 (cleaned up). Other issues may only be addressed if they are "inextricably intertwined" with the qualified immunity analysis. *Veneklase v. City of Fargo*, 78 F.3d 1264, 1269 (8th Cir. 1996). A "district court's qualified immunity determination" is reviewed "*de novo*." *Shannon*, 616 F.3d at 861-62.



Appellate Case: 26-1508 Page: 34 Date Filed: 08/07/2026 Entry ID: 5670027

## ARGUMENT

### I. The district court properly denied Mayor Hansen and Chief Burdess qualified immunity.

Mayor Hansen and Chief Burdess each violated Noah's clearly-established constitutional rights by twice having him arrested in retaliation for his speech criticizing the government. Because they deprived Noah of "rights, privileges, [and] immunities secured by the Constitution," federal law says that they "shall be liable" for those violations. 42 U.S.C. § 1983.

Despite that, both men claim they are shielded from liability by qualified immunity—a judge-made doctrine rooted in neither the text of § 1983 nor the common law in effect when the statute was enacted. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 645 (1987) (explaining that *Harlow* "completely reformulated qualified immunity along principles not at all embodied in the common law"). The doctrine ostensibly ensures that government officials have "fair warning" that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). It asks two questions: (1) whether there was a violation of a constitutional right, and (2) whether that right was clearly established. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021).

The district court answered yes to both, App. 1676, 1679-80, 1684-85; R. Doc. 62, at 23, 26-27, 31-32, finding that the Mayor and Chief are liable

because "[t]he circumstances surrounding both arrests belie any claim to qualified immunity." App. 1675; R. Doc. 62, at 22. Defendants appealed, but they don't contest that Noah's rights were violated.[6] Rather, Defendants quibble over the Mayor and Chief's involvement in the arrests and argue that Noah's First, Fourth, and Fourteenth Amendment rights weren't clearly established.

Defendants are wrong on both points. As the district court correctly explained, "Both arrests were the direct result of [Mayor Hansen]'s official actions," "Chief Burdess made or assisted in making both arrests," and both men violated Noah's clearly-established constitutional rights. App. 1672; R. Doc. 62, at 19. Noah walks through Defendants' individual culpability in **Subsection A** below. In **Subsections B through D**, Noah confirms that his First, Fourth, and Fourteenth Amendment rights were clearly established because "principles governing this case had long been settled" by decades of caselaw that provided Defendants "notice that their conduct was unconstitutional." App. 1673; R. Doc. 62, at 20. Noah then explains in

---

[6] Defendants have a single footnote cursorily defending the Derogatory Comments Rule, but only as to its *facial* constitutionality. Br. 22 n.3. They make no other arguments about the merits, so those issues are waived. And the Court need not address the Rule's facial constitutionality because—as Noah explains below—Defendants' application of the Rule to Noah was clearly unconstitutional. Defendants don't argue otherwise.



Appellate Case: 26-1508 Page: 36 Date Filed: 08/07/2026 Entry ID: 5670027

**Subsection E** that Defendants' arguments to the contrary rely on a misstatement of how law becomes clearly established.

The Mayor and Police Chief repeatedly violated Noah's rights, and any reasonable official in their positions would have known better.

### A. Both the Chief and Mayor caused the violations of Noah's constitutional rights.

The Chief and Mayor both directly caused Noah's unconstitutional arrests. They argue otherwise, each blaming the other (or Lt. Wing) but to no avail. Chief Burdess tries to evade liability for the October 24 incident because he didn't personally arrest Noah—that was Lt. Wing. Br. 28. Or maybe Lt. Wing "was not the official responsible" after all, and the blame rests on the Mayor for his "determination" that Noah violated the Rule. Br. 30. But turn the page, and the Mayor protests that *he* isn't liable because he didn't personally arrest Noah, that was the Chief and his officers. Br. 31-32. Thankfully, there's no need to resolve this finger-pointing: Both the Mayor and Chief Burdess are liable for both arrests. As the district court recognized, § 1983 doesn't confer liability only on the officer who cinches the handcuffs; it extends to "[e]very person who … causes [any person] to be subjected … to the deprivation of any rights … secured by the Constitution." 42 U.S.C. § 1983. The Mayor and Police Chief each did.

### 1. The Chief caused both arrests.

Chief Burdess is liable for both arrests because he personally arrested Noah on October 3 and planned, directed, and participated in Noah's arrest on October 24. The Chief doesn't dispute the October 3 arrest, but he argues that he isn't liable for the October 24 incident because "the arresting officer was Lieutenant Wing." Br. 28. As the Chief admits, however, he is liable for his "individual actions." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). And those actions reveal he was "not only [] the prime mover … in planning and initiating the [arrest] itself," but also a "participa[nt] in the [arrest]" itself. *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991) (rejecting officer's argument that he wasn't liable for search he planned, initiated, and participated in).

Burdess planned the October 24 arrest. App. 411-12; R. Doc. 27-1, at 47-48 ¶¶298-305. He—together with the Mayor and city administrator—decided that if Noah violated the Derogatory Comments Rule, the Mayor would "suspend the business meeting," then allow Chief Burdess and his officers to "step in" and "take it from there" to "try[] to remove the person from the room," along with possible arrest and criminal charges. *Id.* Burdess's involvement didn't end there. To carry out the plan, he "directed" Lt. Wing to attend and stationed him to assist. *Id.* ¶¶304-05. He then joined



Appellate Case: 26-1508 Page: 38 Date Filed: 08/07/2026 Entry ID: 5670027

Lt. Wing in converging on Noah to effectuate the arrest. App. 419-20; R. Doc. 27-1, at 55-56 ¶¶350-59.

From start to finish, Burdess's actions were "integral" to the planning and execution of Noah's October 24 arrest, "render[ing him a] participant[] rather than [a] bystander[]." *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (allowing claims against officer who "did not physically perform the pat-down search" at issue but who "remained armed on the premises throughout the entire search"). Noah can hold him liable for those actions. 42 U.S.C. § 1983; *see also Wesby v. District of Columbia*, 765 F.3d 13, 29-30 (D.C. Cir. 2014), *rev'd on other grounds*, 580 U.S. 1097 (2017) (officers who participated in "investigation and erroneous determination regarding probable cause" liable for "group arrest" even though "they did not personally arrest [plaintiffs]").

**2. The Mayor caused both arrests too.**

Mayor Hansen likewise argues that because he "did not arrest Plaintiff," he "cannot be held liable." Br. 31-32. But his argument—advanced in two citation-free paragraphs—doesn't hold water. As the statutory text conveys, § 1983 liability isn't limited to only the official who "physically perform[s]" the constitutional violation. *James*, 909 F.2d at 837. In *James*, the Fifth Circuit reversed the district court and found officers who "did not



Appellate Case: 26-1508 Page: 39 Date Filed: 08/07/2026 Entry ID: 5670027

physically perform [a] pat-down search" liable for their involvement in that search because their presence and role in detaining *other* people during the search made them "integral to the search … rather than bystanders." *Id.* (cleaned up); *accord Gonzalez v. Trevino*, 602 U.S. 653, 655-56, 659 (2024) (allowing claims to proceed against a mayor and police chief, despite neither's involvement in a physical arrest).

The Mayor's conduct was similarly "integral" to Noah's arrests. Just read Defendants' brief: Two pages before the argument underselling the Mayor's involvement, the brief emphasizes that the Mayor was the "official responsible for determining whether the Rule had been violated … in his capacity as presiding officer." Br. 30. That's true. But it's not the limit of the Mayor's "central role" in Noah's arrests. App. 1672; R. Doc. 62, at 19. On October 3, the Mayor enforced the Rule against Noah, ordered him to stop speaking, called up Chief Burdess, declared Noah was "violating the city rules," and (repeatedly) ordered the Chief to "escort" Noah out of the council chamber. App. 401-02; R. Doc. 27-1, at 37-38 ¶215, ¶¶221-22, ¶226, ¶¶228-29.

The Mayor had an even greater role in Noah's October 24 arrest. The Mayor "plann[ed]" the arrest with Chief Burdess and the city administrator, then "initiat[ed]" the first step of suspending the meeting. *Hall*, 932 F.2d at

1154. The Mayor knew that first step was a signal to the police to arrest Noah—and his plan was followed to a tee. In the language of § 1983, at both meetings Mayor Hansen "cause[d Noah] to be subjected" to unconstitutional arrests, and so Noah can hold him liable.

### B. The Mayor and Chief violated Noah's clearly-established First Amendment rights.

The Mayor and Chief both violated Noah's First Amendment rights by arresting him for calmly criticizing his government, and qualified immunity cannot shield them because those rights were clearly established. Government officials violate clearly-established rights when, "in the light of pre-existing law," officers are "on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted). This Court takes a "broad view" of the possible sources for that notice. *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001). Courts "should look to all available decisional law, including decisions of state courts, other circuits and district courts" to determine whether government officials had "fair notice." *K.W.P. v. Kansas City Pub. Schs.*, 931 F.3d 813, 828 (8th Cir. 2019) (citing *Tlamka*, 244 F.3d at 634). Nor must "the very action in question [] previously [have] been held unlawful." *Hope*, 536 U.S. at 739 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. And even



Appellate Case: 26-1508 Page: 41 Date Filed: 08/07/2026 Entry ID: 5670027

"general statements of law" can give "fair and clear warning" to officers, who may not then claim qualified immunity for their violations. *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

The establishment of Noah's First Amendment rights isn't a close call: Criticism of government has been central to the American tradition since the 1700s. And the district court correctly determined that the Mayor and Chief were "on notice that their conduct was unconstitutional" and violated Noah's clearly-established First Amendment rights in three ways, each of which confers liability. **First,** Noah had a right to criticize the government and its officials. **Second,** Noah had a right to be free from viewpoint discrimination. **Third,** Noah had a right to be free from retaliation for his speech. Noah further explains each below and, **fourth,** rebuts Defendants' claim that they are nevertheless entitled to qualified immunity because they "reasonably believed" Noah's protected speech was unprotected defamation.

#### 1. It was clearly established that Noah had a right to criticize government officials.

As the district court found, Noah's right to "subject public officials to sharp criticism" was not only clearly established, it "stands at the core of First Amendment protection." App. 1673; R. Doc. 62, at 20. The court cites *New York Times Co. v. Sullivan*, where the Supreme Court recognized that the First Amendment creates "a profound national commitment to the principle

that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. 254, 270 (1964). *See also Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018) (same). And "this protection applies with particular force," the district court added, "at public meetings where citizens address their elected representatives," App. 1673; R. Doc. 62, at 20 (citing in part *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175-76 (1976) (holding that government bodies may not engage in viewpoint discrimination at public meetings)).

Defendants accuse the district court of errantly denying qualified immunity without "comparable … precedent," Br. 21, but never mention either of these Supreme Court cases that the district court invoked. Nor do Defendants mention the Supreme Court's holdings in *Lozman*, 585 U.S. 87, or *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963), or this Court's decision in *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019). Noah cited *all* these cases (and more) in his briefing below, yet Defendants engage with none of them when arguing Noah was wrong.

Perhaps Defendants ignore these cases because they have little to say in response. It's been the law of the land for sixty years that the government

may not "make criminal the peaceful expression of unpopular views." *Edwards*, 372 U.S. at 237. "There is no room under our Constitution for a more restrictive view." *Id.* at 237-38. Cases they do cite—like *Janklow v. Newsweek*—earn no more than a passing mention, Br. 34, without explanation for how the Mayor and Chief could have misinterpreted that "speech about government and its officers, [and] about how well or badly they carry out their duties, lies at the very heart of the First Amendment." 788 F.2d 1300, 1304 (8th Cir. 1986). Indeed, "[c]riticism of law enforcement officers, even with profanity, is protected speech." *Thurairajah*, 925 F.3d at 985.

Faced with only Noah's calmly-delivered, profanity-free opinions, the Mayor and Chief had ample time (and decades of caselaw) to consider their constitutional responsibilities and act accordingly. They silenced Noah anyway, violating clearly-established law.

#### 2. It was clearly established that Noah had a right to be free from viewpoint discrimination.

The district court also held that Noah's right to be free from viewpoint discrimination was clearly established. App. 1673; R. Doc. 62, at 20. Defendants agree that the Citizen Participation periods of Newton city-council meetings were "limited public forums." Br. 17. The Supreme Court has been clear that "[w]hen the State establishes a limited public forum …



Appellate Case: 26-1508 Page: 44 Date Filed: 08/07/2026 Entry ID: 5670027

[it] must not discriminate against speech on the basis of viewpoint." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). And the district court notes that this Court has "explicitly recognized that speakers possess a clearly established 'right not to be subjected to viewpoint discrimination while speaking in a limited public forum.' *Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017)." App. 1673; R. Doc. 62, at 20.

The district court also cites two Supreme Court cases (see below), but *Gerlich* is its lead case because it resolves the issue. Yet, mystifyingly, Defendants ignore *Gerlich* entirely. They claim that "the district court had no comparable Eighth Circuit precedent" and thus turned to Supreme Court cases "[i]nstead." Br. 21. But they don't distinguish—or even cite—*Gerlich*, or explain why its holding on one "limited public forum" wouldn't apply to Newton's forum. And (once again) they don't cite the cases Noah analyzed in his MSJ briefing, like *Business Leaders in Christ v. University of Iowa*, where this Court held that it is "clearly established that [the government] may not discriminate on the basis of viewpoint in a limited public forum." 991 F.3d 969, 985 (8th Cir. 2021).

The district court relied on the Supreme Court's holdings in *Iancu v. Brunetti*, 588 U.S. 388 (2019), and *Matal v. Tam*, 582 U.S. 218 (2017), because Defendants (below and here) lean heavily on Mayor Hansen "rul[ing

Noah] out of order" to excuse Defendants' unconstitutional conduct. Br. 18. But no city-council "rule" could give license to ignore clearly-established law and punish Noah for his views. What *Brunetti* and *Tam* make clear is that the Rule itself was unconstitutional—banning "derogatory" comments while "of course" allowing those "supporting the police." App. 399; R. Doc. 27-1, at 35 ¶204. Such rules are the "essence of viewpoint discrimination." *Brunetti*, 588 U.S. at 393 (quoting *Tam*, 582 U.S. at 221, and striking down ban on registration of "immoral" or "scandalous" trademarks). *Brunetti* built on *Tam*, which is directly on point. Federal law prohibited "trademarks that may 'disparage or bring into contempt or disrepute' any 'persons, living or dead.'" *Tam*, 582 U.S. at 223 (cleaned up). In short: derogatory trademarks. The Supreme Court struck down the ban, holding that "no disparagement" rules "offend[] a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." *Id.*

The facts in *Tam* and *Brunetti* may be different from those here, but the "bedrock First Amendment principle" they recognized placed Mayor Hansen and Chief Burdess "on notice" that enforcing a non-disparagement rule "violate[d] established law." *Hope*, 536 U.S. at 741. *See also infra*, Section I-E-2 (discussing *Sause v. Bauer*, 585 U.S. 957, 959-60 (2018)). And when courts *are* confronted with facts like Noah's, they apply *Tam* and

*Brunetti* the same way the district court did. *See Boddy v. Frech*, 178 F.4th 264, 273 (6th Cir. 2026) (enjoining enforcement of public-meeting decorum rule against criticism of public officials based on holdings in *Tam* and *Brunetti* that "the government's regulation of offensive speech may constitute viewpoint discrimination"). "Giving offense is a viewpoint," so non-disparagement rules are unconstitutional. *Tam*, 582 U.S. at 243; *see also Merriott v. City of Bossier City*, 179 F.4th 393, 410–11 (5th Cir. 2026) (applying *Tam* to city-council rule).

**3. It was clearly established that Noah had a right to be free from retaliation for his speech.**

Third, the district court held that Noah's "right to criticize the police without fear of government retaliation has been clearly established." App. 1673; R. Doc. 62, at 20 (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and *Molina v. City of St. Louis*, 59 F.4th 334, 343 (8th Cir. 2023)). *Hartman* laid the groundwork, recognizing that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." 547 U.S. at 256. *Molina* applied that principle to a case where a protester sued police officers who launched a tear gas canister at him after he followed them and yelled "[g]et the fuck out of my park." 59 F.4th at 343. This Court allowed the protester's retaliation

claim to proceed because his "right to be free from retaliation" was "clearly established" in 2015. *Id.*

That's true even when the retaliation comes as enforcement of a rule or ordinance. In *City of Houston v. Hill* (discussed in Noah's MSJ briefing), the Supreme Court explained that "one of the principal characteristics by which we distinguish a free nation from a police state" is "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest." 482 U.S. 451, 462-63 (1987). So when an ordinance prohibited speech that "interrupt[s] any policeman," the Court struck it down under the First Amendment because it criminalized protected speech and gave officers the unconstitutional cover and discretion to arrest only the individuals "chosen by the police." *Id.* at 466-67. Such a rule, the Supreme Court said, failed to provide "the 'breathing space' that 'First Amendment freedoms need … to survive.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

In a recurring theme, Defendants address none of these cases. They don't contest that they arrested Noah for his speech, nor that retaliatory arrests are unconstitutional. But they repeatedly claim qualified immunity under *Nieves v. Bartlett*, arguing that any retaliation claim is defeated by



Appellate Case: 26-1508 Page: 48 Date Filed: 08/07/2026 Entry ID: 5670027

their "[a]rguable probable cause" to arrest Noah. Br. 29-30 (citing *Nieves*, 587 U.S. 391, 406 (2019)).

Defendants' reliance on *Nieves* is misplaced. *Nieves* clearly established that retaliatory arrests are unconstitutional in "the absence of probable cause," 587 U.S. at 404, and here Defendants lacked even "arguable" probable cause because it was "clearly established that protected speech cannot serve as the basis for probable cause." App. 1680; R. Doc. 62, at 27 (citing *Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022)). *See infra*, Section I-C. But even if Defendants could show probable cause, their *Nieves* argument would still fail. *Nieves* held that probable cause defeats retaliatory arrest claims *if* the arrest was a "split-second judgment[]" *and* there's no "evidence" of selective enforcement. 587 U.S. at 401, 407. Neither is true here.

To begin, Noah calmly reading statements off his phone required no "split-second judgments" from Defendants. A suspect's speech can be a "consideration" for an arresting officer in some circumstances, but that's if the officer is making "split-second judgments when deciding whether to arrest," such as evaluating a "continuing threat." *Id.* at 401. *See also Gonzalez*, 602 U.S. at 658 (leaving open whether *Nieves* "applies only to claims predicated on split-second arrests, rather than deliberative ones").



Appellate Case: 26-1508 Page: 49 Date Filed: 08/07/2026 Entry ID: 5670027

Noah was never a threat. Nobody claims Noah was "combative" or raised concerns of officer safety. *Cf. Nieves*, 587 U.S. at 395-96 (arrestee was "belligerently yelling," "highly intoxicated," "aggressive," and "combative"). And the second arrest was *pre-planned*. *See supra*, Statement of the Case Section III. Without *Nieves*'s quick-reflex threat assessment, no "probable cause" determination that included protected speech could defeat Noah's retaliation claim. *See Novak*, 33 F.4th at 304.

And even if the Court found probable cause *and* split-second judgments, *Nieves* still doesn't defeat Noah's claim because its selective-enforcement exception applies. The "existence of probable cause does not defeat a plaintiff's [retaliation] claim if he produces 'objective evidence'" of selective enforcement." *Gonzalez*, 602 U.S. at 655 (quoting *Nieves*, 587 U.S. at 407). As Noah explains below in Section I-D, here there is ample "objective evidence that [Noah] was singled out." App. 1682; R. Doc. 62, at 29. *See also supra*, Statement of the Case Section IV.

#### 4. It was clearly established that Noah's comments were protected speech, not defamation.

Mayor Hansen's last-ditch defense is that he could silence Noah's critiques of government officials as unprotected "defamation," Br. 33-35, but the district court correctly held otherwise: Noah's criticisms were either "substantially true" or "protected opinion." App. 1666; R. Doc. 62, at 13. On

October 3, the Mayor knew Noah's claim that the police were employing a "domestic abuser" was true, not defamatory. The Mayor understood Noah meant Officer Winters, *see* Br. 34, and the Mayor had personally confirmed to Noah that Winters was subject to a no-contact restraining order based on a domestic abuse petition. App. 389-90; R. Doc. 27-1, at 25-26 ¶¶139-45. On those facts, Noah's claim that Winters was a "domestic abuser" was substantially true. *Galanakis*, 2024 WL 606235, at *15-17 (accusations that Winters "beat[] up his ex girlfriend" "must be treated as substantially true"). *See also Galanakis v. Newton*, No. 4:23-cv-00044-SHL-SBJ, 2023 WL 3479167, at *8 (S.D. Iowa May 8, 2023) ("[I]t is not inaccurate to say [Winters] has a 'domestic abuse history[.]'").

The October 24 incident is even more clear cut: Noah called the Mayor and Chief "fascists," which this Court has cited as a paradigmatic example of a statement that is "indefinite and therefore opinion." *Janklow*, 788 F.2d at 1302 (citing *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976)). The Mayor acknowledges *Janklow*, but claims his "real-time judgment" was nevertheless "objectively reasonable." Br. 35. That's simply irrelevant because there is no "objective reasonableness element to the Supreme Court's two-pronged test for qualified immunity." *Hicks v. LeBlanc*, 81 F.4th 497, 503 n.14 (5th Cir. 2023) (cleaned up).

*       *       *

Mayor Hansen and Chief Burdess ignored every layer of clearly-established law. They ignored Noah's clearly-established right to voice his criticisms during the city-council meeting. They ignored Noah's clearly-established right not to be discriminated against based on the viewpoint expressed through his criticisms. They ignored Noah's clearly-established right not to be retaliated against for his speech. And Mayor Hansen's sole defense—that Noah's criticisms were defamation, not protected speech—ignored clearly-established law holding the opposite. As a result, neither Mayor Hansen nor Chief Burdess is entitled to qualified immunity for Noah's First Amendment claims.

### C. The Mayor and Chief also violated Noah's clearly-established Fourth Amendment right against unreasonable seizure.

Noah also brought Fourth Amendment claims against Mayor Hansen and Chief Burdess for his two arrests, and "[i]t is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). There was no probable cause to arrest Noah at either meeting in October 2022. Since both men caused the arrests, *see supra*, Section I-A, the



Appellate Case: 26-1508 Page: 52 Date Filed: 08/07/2026 Entry ID: 5670027

district court correctly held that the Mayor and Chief are both "liable for the unreasonable seizures." App. 1679; R. Doc. 62, at 26.

Chief Burdess objects,[7] repeatedly stressing that he need only show "arguable probable cause" to establish immunity. Br. 12, 19, 24-25, 28-29. That's true, but it's just the "clearly established" inquiry by another name. *Brown v. City of St. Louis*, 40 F.4th 895, 901 (8th Cir. 2022) (recognizing that "the issue of arguable probable cause is properly part of the resolution of qualified immunity's second prong, the clearly established prong"). Officers have qualified immunity if they "had arguable probable cause to arrest … meaning that it was not clearly established that doing so would violate [the plaintiff's] right to be free from unlawful seizure … or First Amendment retaliation." *Id.* at 903. Officers accordingly *lack* qualified immunity when it's clearly established that an arrest *would* violate the plaintiff's rights. That is the case here.

As Noah explains throughout this brief, the district court was correct to hold that arresting Noah for his speech based on the Derogatory Comments Rule violated his clearly-established rights, *see* App. 1679-80; R. Doc. 62, at 26-27, and so Chief Burdess lacked arguable probable cause to

---

[7] Mayor Hansen rests entirely on his argument that he is somehow not responsible for the arrests he ordered and planned and offers no other argument against his Fourth Amendment liability. *See* Br. 31-34.



Appellate Case: 26-1508 Page: 53 Date Filed: 08/07/2026 Entry ID: 5670027

arrest at either meeting. At the time of the arrests, "it was clearly established that officers cannot arrest citizens based on the content of their speech." App. 1680; R. Doc. 62, at 27 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992)). It was likewise "clearly established that protected speech cannot serve as the basis for probable cause." *Id.* (citing *Novak*, 33 F.4th at 304); *accord Molina*, 59 F.4th at 343; *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 792 (N.D. Iowa 2007) (collecting cases).

Chief Burdess says that he arrested Noah for "conduct," not speech. Br. 26. But the only "conduct" Chief Burdess identifies is Noah's refusal to "stop speaking" when ordered to by Mayor Hansen. *Id.* Arresting someone for refusing to stop speaking is just another way of saying you are arresting them for speaking. At both meetings, Noah was abiding by all *constitutional* rules governing his speech and was entitled to speak for his full three minutes. The Chief knew—because Mayor Hansen said it—that the sole basis of Mayor Hansen's order was Noah's criticism of government officials and the supposed violation of the Derogatory Comments Rule. And, given Noah's calm, non-threatening demeanor, the Chief can't claim confusion during a split-second decision for even the October 3 arrest, let alone the October 24 arrest that he planned weeks in advance. He had ample time to realize that Noah's criticism was protected and that the Rule was unconstitutional.

Nor can Chief Burdess hide behind Mayor Hansen; the Chief had an independent obligation not to violate Noah's rights. His own hypothetical proves the point: At deposition, he explained that he could not arrest someone under the disorderly conduct statute if "someone walks up there and they're black and the mayor says, 'I don't want you here because you're black, and you have to leave.'" App. 406; R. Doc. 27-1, at 42 ¶261. But under Chief Burdess's argument, he would *still* have "arguable probable cause" to arrest a black speaker if Mayor Hansen had a rule against non-white speakers. Such an arrest, of course, would easily violate clearly-established law. So too here. Case after case establishes that government officials cannot discriminate against speakers or arrest them for their viewpoints. *See supra*, Section I-B-2. But that's what Chief Burdess did.

Last, Chief Burdess points to *State v. Hardin* to argue that the Iowa Supreme Court has somehow blessed Noah's arrest under Iowa's disorderly conduct statute. Br. 26. Not so. In *Hardin*, the plaintiff heckled and disrupted a speech by then-President George H.W. Bush. 498 N.W.2d 677, 678 (Iowa 1993). The heckler stood up and shouted during the event when he had no right to speak. *Id.* But Noah *did* have the right to speak during the city-council meeting, and Noah's right (unlike hecklers who shout out-of-turn) was clearly established. *See supra*, Section I-B. Chief Burdess points to



Appellate Case: 26-1508 Page: 55 Date Filed: 08/07/2026 Entry ID: 5670027

a few scattered out-of-circuit cases that came out the other way, but doesn't explain why it would be reasonable to rely on those cases rather than the mountain of Supreme Court and Eighth Circuit caselaw clearly establishing Noah's right to speak.[8] It wasn't; neither Chief Burdess nor Mayor Hansen is entitled to qualified immunity on Noah's Fourth Amendment claims.

### D. The Mayor and Chief also violated Noah's clearly-established Equal Protection rights.

Last, the district court was correct that Noah's "right to equal protection from selective enforcement was [also] clearly established by October 2022," and "[a]ny reasonable official would have recognized" that Noah's arrests violated that right. App. 1684; R. Doc. 62, at 31 (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). The Supreme Court held four decades ago that the Equal Protection Clause prohibits selective enforcement "based upon an unjustifiable standard," such as "the exercise of … constitutional rights." *Wayte*, 470 U.S. at 608 (citation omitted). As discussed above, retaliating against Noah for his criticism of Newton officials

---

8 The Chief also claims to have "reasonably relied" on the city's attorneys "declar[ing]" the Rule "constitutional," Br. 27, but he also acknowledges that "reliance on the advice of counsel alone will not satisfy an official's burden of acting reasonably." *Watertown Equip. Co. v. Norwest Bank Watertown, N.A.*, 830 F.2d 1487, 1495 (8th Cir. 1987). When rights are clearly established, officials like the Chief are "on notice" that they must not violate them. *Hope*, 536 U.S. at 741.

violated his constitutional rights under the First Amendment. *See supra*, Section I-B-3. And this Court "assume[s] for purposes of analysis that" enforcement and prosecutorial actions may "run afoul of the Constitution if [they] flow[] from … [this] impermissible motive[]." *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009) (citing *St. German of Alaska E. Orthodox Cath. Church v. United States*, 840 F.2d 1087, 1095 (2d Cir. 1988)).

The record here is damning. The Derogatory Comments Rule was only *ever* enforced against Noah—nobody else was ever silenced, expelled from a city-council meeting, arrested, charged, or prosecuted because of their speech at a Newton city-council meeting. Other violations of this and other public comment rules were simply ignored. *See supra*, Statement of the Case Section IV. Fred Rhodes and Dana VanGilder both accused an individual—the City rental inspector—of fraud and corruption. App. 392-96; R. Doc. 27-1, at 28-32 ¶165, ¶169, ¶174, ¶182. Mayor Hansen says these allegations were "totally false" and "wrong" (App. 393, 396; R. Doc. 27-1, at 29 ¶166, 32 ¶184)—and that both speakers "should have known" their statements were false. App. 392-93; R. Doc. 27-1, at 28-29 ¶¶163-64, ¶167, 32 ¶185. But Mayor Hansen did nothing. He didn't gavel them down, enforce the Derogatory

Comments Rule, stop them from speaking, or call up the police. And they weren't handcuffed, arrested, and jailed.

But when it came to Noah *at the same meeting*, Mayor Hansen determined that Noah *did* violate the Rule for doing the same thing—making a "false" comment about an "individual." According to Mayor Hansen, Noah made "false statements" about "the police chief, the police department, and the individual he identified was an abuser." App. 398; R. Doc. 27-1, at 34 ¶¶198-99, ¶201. But this time, unlike Fred and Dana (and others), Noah was silenced under the Rule. As the district court concluded, this "pattern constitutes objective evidence that [Noah] was singled out." App. 1682; R. Doc. 62, at 29. The actions taken against Noah were solely to retaliate against him for exercising his First Amendment rights to speak out against the police (and, on October 24, the Mayor). App. 398, 418; R. Doc. 27-1, at 34 ¶¶195-96, 54 ¶¶341-42.

Defendants claim that Fred and Dana aren't similar enough to Noah because Noah's (truthful) criticism of Officer Winters concerned domestic abuse instead of fraud and corruption. Br. 37. They claim that Noah's criticisms came with "social baggage" because they concerned the "Defund the Police" movement and the "social upheaval" surrounding Tayvin's arrest. Br. 37-38. And they claim that these "differen[ces]" justify "treat[ing Noah's]

comments differently" than other violators of the Rule. Br. 38. To the contrary, these differences highlight that Defendants treated Noah differently for the content of his speech.

What Defendants are describing is textbook viewpoint discrimination, which is "presumptively unconstitutional." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "In this Nation, no official—'high or petty'—may command our tongues or silence our voices." *Chiles*, 146 S. Ct. at 1021 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). And they certainly may not do so based on the "social baggage" of certain political perspectives while allowing speech they deem less objectionable. Fred and Dana "were similarly situated to [Noah] in all relevant respects," App. 1681; R. Doc. 62, at 28, and Defendants provide no constitutional explanation justifying the Mayor's enforcement of the Rule against only Noah.[9]

[9] Defendants also complain that the district court did not provide "similarly situated comparators" proving selective enforcement at the October 24 meeting, since Fred and Dana spoke on October 3. Br. 39. But they don't explain why those comparators would need to be at the same meeting, especially since the history of the Rule shows it "was never enforced except against [Noah]." App. 1682; R. Doc. 62, at 29.

### E. Defendants are mistaken that a right is only clearly established if an earlier case addressed the exact same facts.

The cornerstone of Defendants' appeal (and their justification for ignoring case after case that the district court cites) is their theory that an earlier case must be a near-exact match to clearly establish a right—otherwise, qualified immunity attaches. *See* Br. 18. But no such exact match is required. "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas*, 595 U.S. at 5 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). That can be through an earlier case, *Reichle v. Howards*, 566 U.S. 658, 664 (2012), or through general principles of constitutional law, *Hope*, 536 U.S. at 741; *see also Taylor v. Riojas*, 592 U.S. 7 (2020) (reversing grant of qualified immunity in an obvious case without identifying any case clearly establishing the law).

Defendants apply a far stricter standard: that "even a factually similar case, from within the same federal circuit, does not necessarily clearly establish the law." Br. 21. But that's wrong, and Defendants' error is based on a serious misunderstanding of two Eighth Circuit cases they cite: *Morgan v. Robinson*, 920 F.3d 521 (2019), and *Nord v. Walsh County*, 757 F.3d 734 (2014). **First**, Noah explains Defendants' misunderstanding. **Second**, he



Appellate Case: 26-1508 Page: 60 Date Filed: 08/07/2026 Entry ID: 5670027

shows why Supreme Court and circuit precedent make Defendants' "exact match" approach particularly problematic in Noah's case.

### 1. Defendants' view of *Nord* and *Morgan* is mistaken.

Briefly, *Nord* and *Morgan* both involved sheriffs' deputies suing sheriffs who fired them, allegedly unconstitutionally. *See id.* And in both cases, the court held that no clearly-established right was violated and granted qualified immunity to the sheriff. 920 F.3d at 525; 757 F.3d at 739. Along the way to granting qualified immunity, the *Nord* court "[a]ssum[ed], *without holding*" that there was a constitutional violation—before holding that it wasn't clearly established regardless. 757 F.3d at 739 (emphasis added). It never claimed to find a constitutional violation or establish a right going forward.

But Defendants seem to misunderstand *Nord*'s assumption as holding that there *was* a violation. *See* Br. 21. They then present that assumption as establishing a rule of law that was distinguished in *Morgan* despite the similar facts. *Id.* That's not what happened. *Nord* did not decide whether the firing was constitutional. So when *Morgan* considered the constitutionality of a similar firing, *Nord* hadn't clearly established the law.[10] *Morgan*, 920

[10] *Nord* was also decided "one month" *after* the firing in *Morgan*, so even if the *Nord* court had found a violation, that decision wouldn't have clearly established the law for the parties in *Morgan*. *Morgan*, 920 F.3d at 526.

F.3d at 526-27. *Morgan* is a straightforward application of a holding from a nearly-identical case, *not* a sign that courts will disregard even "factually similar case[s]" to grant qualified immunity. *Contra* Br. 21.

Getting *Morgan* backwards is a real problem for Defendants, who list it as their "Most Apposite Case[]" on their lead appellate issue and repeatedly rely on it to attack the district court's qualified immunity analysis. Br. 2. *See also* Br. 16, 19-21, 23. And it apparently led them to ignore Supreme Court and circuit caselaw that forecloses their theory. *See, e.g.*, *Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances[.]"); *Tlamka*, 244 F.3d at 634 (holding that lack of "any decisions involving facts similar to those presented in this case" was "not dispositive" for the clearly-established "inquiry"); *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) ("[I]t defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).").

**2. Defendants' errant application of *Morgan* is particularly misplaced in a First Amendment case like Noah's without split-second decisions.**

While an exact match is *never* necessary, the Supreme Court and this Court have also repeatedly emphasized that factual distinctions are even less

important when, as here, officials aren't making split-second decisions to use force, and when the First Amendment is involved.

When officials "have time to make calculated choices about enacting or enforcing unconstitutional policies," they should *not* "receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting[.]" *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of certiorari); *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) (same); *accord Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (denying qualified immunity where "there is nothing to indicate that [the officer] was faced with the need to make any split-second decisions, nor can the circumstances fairly be described as constituting a 'tense, uncertain, and rapidly evolving' situation" (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989))). When officials aren't faced with an imminent threat, we expect them to better apply established constitutional principles to their specific situation. *See Villarreal v. City of Laredo*, 134 F.4th 273, 277 (5th Cir. 2025) (en banc) (Oldham, J., concurring) ("When an officer has the time to make … plans, to consult counsel, and to investigate all the facts, it is unclear whether and to what extent qualified immunity should apply.").

And factual differences with prior caselaw matter the least in First Amendment cases. Take the Supreme Court's decision in *Sause v. Bauer* denying qualified immunity to officers who stopped a woman from praying after they broke into her apartment answering a noise complaint. 585 U.S. 957, 960 (2018). The Tenth Circuit had granted qualified immunity to the officers, reasoning that the woman failed to "identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." *Sause v. Bauer*, 859 F.3d 1270, 1275 (2017). The Supreme Court reversed because the officers could have been on notice that interfering in prayer violated the Constitution despite the lack of on-point cases. *Sause*, 585 U.S. at 959-60; *see also Safford United Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377-78 (2009) (applying the same principle). The *Sause* decision makes sense because the First Amendment requires special protection and broad rules that err on the side of more speech. *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Failing to extend those protections to the qualified immunity analysis would require would-be speakers to "necessarily guess" at whether their speech is protected, creating a chilling effect. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010) (cleaned up).

## II. The district court properly found *Monell* liability, which cannot be reviewed on this interlocutory appeal

Though Mayor Hansen and Chief Burdess may appeal the denial of qualified immunity before final judgment, the "interlocutory appeal of the City is not properly before" this Court. *Veneklase v. City of Fargo*, 78 F.3d 1264, 1269 (8th Cir. 1996). The City's liability under *Monell* is not "inextricably intertwined" with the Mayor and Chief's qualified immunity defenses, as Noah explains below in **Subsection A**. *Id.* If this Court nevertheless reaches the *Monell* issue, it should affirm the district court in finding the City liable (**Subsection B**).

### A. This Court lacks interlocutory appellate jurisdiction over the City's liability.

This Court lacks jurisdiction over the City of Newton's interlocutory appeal. Municipalities are not entitled to interlocutory review on *Monell* claims unless their *Monell* liability is "inextricably intertwined" with "the individual defendants' qualified immunity." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995). Here it isn't: Mayor Hansen and Chief Burdess's "qualified immunity turns on whether they violated clearly established federal law," *id.*, whereas the City is simply arguing about whether the Mayor and Chief's "edicts [and] acts may fairly be said to represent official policy" (which would trigger *Monell* liability), *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). *See* Br. 43-45. The Mayor



Appellate Case: 26-1508 Page: 65 Date Filed: 08/07/2026 Entry ID: 5670027

and Chief appeal solely on whether Noah's rights were clearly established, not on whether Noah's rights were violated. And whether Noah's rights were clearly established is a separate legal inquiry from whether his arrests were official City policy. "[R]esolution of these two issues requires entirely different analyses." *Veneklase*, 78 F.3d at 1270.

The City asks to hitch a ride on the Mayor and Chief's qualified immunity appeal because "individual liability is a predicate for municipal liability," Br. 40, but that's wrong: "*Monell* claims survive despite the individual officers' qualified immunity from suit." *Molina v. City of St. Louis*, 766 F. Supp. 3d 857, 868 (E.D. Mo. 2025) (citing *Webb v. City of Maplewood*, 889 F.3d 483, 486 (8th Cir. 2018) ("a municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable")). Pendent jurisdiction only exists if the City's "official policy" appellate issue is resolved by "the same constitutional test" as the Mayor and Chief's "clearly established" issue. *Kincade v. City of Blue Springs*, 64 F.3d 389, 395 (8th Cir. 1995). But there's no such connection here. *See Molina*, 766 F. Supp. 3d at 870 (no part of "municipal liability" requires that "a right must be clearly established"). And allowing qualified immunity to control municipal liability "would risk granting the City de facto

qualified immunity. Such a reading would be fundamentally inconsistent with *Monell* and with Eighth Circuit precedent." *Id.* at 872.

Defendants don't analyze any of these cases, and their argument is dead on arrival.

### B. The district court correctly held the City liable.

Of course, if the Court does have jurisdiction, the City's liability is clear. The record shows that the City is liable for all the unconstitutional actions taken against Noah in October 2022 under *Monell* because those actions were all ostensibly predicated on an official city policy: the Derogatory Comments Rule. And Newton is "liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

The City argues that the Rule wasn't official policy because it was adopted by the Mayor and the City Council could have overridden him (though it didn't), but the district court gets it right in holding that "the mere existence of theoretical oversight does not defeat policymaking authority." App. 1686; R. Doc. 62, at 33 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (noting that policymaking authority may exist even where decisions are subject to review)). And the City's position is

impossible to square with its admission in the next paragraph that the Rule was "in place since 2019, reviewed and approved by city attorneys, read aloud at every council meeting without objection from the council member who was an attorney, and affirmatively declared constitutional by outside legal counsel" in October 2022. Br. 45.

The City is describing an official policy. Municipalities are liable for policies "set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.'" *Felts v. Green*, 91 F.4th 938, 942 (8th Cir. 2024) (quoting *McMillian v. Monroe County*, 520 U.S. 781, 784 (1997), and *Monell*, 436 U.S. at 694). Even a "single decision" is sufficient. *Id.* "[D]elegating policymaking authority to a subordinate or ratifying the actions of a subordinate" also creates liability. *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017). As does tolerance of unconstitutional actions that the policymaker has "reason to know" are occurring. *Mitchell v. Kirchmeier*, 28 F.4th 888, 901 (8th Cir. 2022). When the City Council repeatedly chose not to step in and reverse the Rule, that "tolerance" and "acquiescence" confirmed the Rule as official policy.

The City is also liable because Noah's two arrests were predicated on its unconstitutional Rule. At both October meetings, the enforcement actions taken against Noah were taken by, delegated, ratified, or tolerated by the



Appellate Case: 26-1508 Page: 68 Date Filed: 08/07/2026 Entry ID: 5670027

City's policymakers: its mayor, city council, and city administrator (who supervises the chief of police). App. 365-66; R. Doc. 27-1, at 1-2 ¶¶3-7. It was Newton's mayor who enforced the Rule against Noah at both meetings. App. 417-420; R. Doc. 27-1, at 53-56 ¶¶339-48, ¶¶355-56. It was Newton police officers, including its chief of police, who arrested Noah based on the Mayor's decision. App. 386-88, 401-02, 407; R. Doc. 27-1, at 22-24 ¶¶122-23, ¶130, 37-38 ¶215, ¶¶221-22, ¶226, ¶229, 43 ¶268, 55-57 ¶350, ¶¶356-63. It was for violating Newton policy that Noah was jailed and prosecuted. App. 409-10; R. Doc. 27-1, at 45-46 ¶¶281-87. And it was the city's policymakers who formed a plan to arrest Noah if he again criticized the government. App. 411-12; R. Doc. 27-1, at 47-48 ¶¶293-303.

The City's rebuttals are paper-thin. They claim there was no official plan to re-arrest Noah, but it's hard to know what else to call it when a city's mayor, city administrator, and police chief get together after arresting a critic to discuss "how do we deal with this" if it happens again. App. 411; R. Doc. 27-1, at 47 ¶¶295-96. The plan they created was followed exactly on October 24. Sure, they might *also* have used their plan to arrest "anyone" who engaged in banned criticism, Br. 43, but that's hardly the excuse the City presents it as. Even before the plan, on October 3 Noah was arrested by the

Chief of Police, on order of the Mayor, for violating city policy, as the city council looked on and did not stop it. The City arrested Noah.

Every unconstitutional act—the enforcement of the Derogatory Comments Rule, and Noah's retaliatory and unjustified arrests, detentions, and prosecutions—were carried out under City policies and decisions made by city policymakers. At the very least, all the unconstitutional acts were ratified by City policymakers—in fact, the City doubled down. Rather than reprimand the Mayor and officers involved in Noah's arrests, Newton criminally charged and prosecuted Noah for alleged violations of official city ordinances. App. 423, 428; R. Doc. 27-1, at 59 ¶380, 64 ¶¶402-08. Nowhere does the City claim that any city officials acted improperly or faced discipline in their enforcement and retaliatory actions against Noah.

*Monell* liability here is not a hard call. This is not a case in which the Court must connect the dots between a city policymaker's decision and a rank-and-file police officer's decision in the field months or years down the line. City policymakers *directly* retaliated against Noah. And the City is liable for that retaliation.



Appellate Case: 26-1508 Page: 70 Date Filed: 08/07/2026 Entry ID: 5670027

## CONCLUSION

For the above reasons, the Court should affirm the district court's denial of qualified immunity, decline to consider any remaining issues, then remand for a trial on damages.

Date: August 5, 2026.


*/s/ James T. Knight II*

Gina Messamer
PARRISH KRUIDENIER, LLP
2910 Grand Avenue
Des Moines, IA 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

James T. Knight II
Patrick Jaicomo
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
jknight@ij.org; pjaicomo@ij.org

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced type-face using Microsoft Word in Georgia 14-point font.

3. This brief complies with Circuit Rule 28A(h)(2), this document has been scanned for viruses and is virus free.

*/s/ James T. Knight II*
James T. Knight II



Appellate Case: 26-1508 Page: 72 Date Filed: 08/07/2026 Entry ID: 5670027

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. All parties were served by and through the CM/ECF system.

*/s/ James T. Knight II*
James T. Knight II